Filed 10/16/20  Cox v. Wilson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SARA COX,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GRACE WILSON,<br><br>    Defendant and Appellant. | D076492<br><br><br>(Super. Ct. No. 37-2019-00020395-CU-HR-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Matthew Brower, Judge.  Affirmed.

Grace Wilson, in pro. per., for Defendant and Appellant.

Sara Cox, in pro. per., for Plaintiff and Respondent.

Defendant Grace Wilson, appearing in propria persona as she did in the trial court, appeals the civil harassment restraining order (sometimes, Order) issued pursuant to former[1] Code of Civil Procedure[2] section 527.6 in favor of plaintiff Sara Cox.  As discussed in more detail *post*, Wilson in her opening brief (as opposed to her brief in reply) contends that the Order violates due process of law, and is not supported by substantial evidence.  As we explain, we disagree with both contentions and affirm the Order.[3]

FACTUAL AND PROCEDURAL BACKGROUND

*Petition for Civil Harassment Restraining Order*

Cox on April 19, 2019, filed a petition for a civil harassment restraining order against Wilson.  In support of her petition, Cox stated under penalty of perjury that Wilson was the former spouse of Cox's ex-boyfriend and lawyer, Bruce Wilson (Bruce); that a day earlier, Wilson had sent an e-mail to Cox's "professional contact stating that [Cox's] boss was wrong to recommend [Cox] on LinkedIn"; that Wilson had threatened to "come to [Cox's] work, and contact everyone [Cox] kn[e]w including [her] employers, family, and friends"; that Wilson also had slandered Cox by posting on Cox's LinkedIn account;

---

[1]    Section 527.6 was amended effective January 1, 2020.  (See Stats. 2019, ch. 294 (Assem. Bill No. 925).)  This amendment has no substantive bearing on the outcome of this case.

[2]    Unless otherwise noted, all further statutory references are to the Code of Civil Procedure.

[3]    Wilson on September 17, 2020, filed in this court a "Motion for Order Vacating Lower Court's Verdict and in the alternative to Strike Respondent's Briefs & Supporting Memorandum," along with her second application to augment the record.  A day later, this court notified the parties that Wilson's September 17 motion and request would be considered with the appeal.  We have considered Wilson's September 17 motion and request and hereby deny them.

that Wilson had accused Cox of theft and other unflattering behavior including with Bruce, whom Cox had stopped dating in June 2018; and that, despite not dating Bruce for about 10 months, Wilson continued to harass Cox, causing Cox to suffer emotional distress as she feared Wilson would show up at her home or work.

Cox also discussed her former relationship with Bruce, noting: "When I dated Bruce I was under the impression that he was getting a divorce, and he was my divorce lawyer in my [then-]current situation as well. I regret being with him because he was not honest with me, and has since caused havoc in my life. Respondent [Wilson] has blamed me for this situation from the beginning, but I am not the reason that her relationship fell apart. She has not been able to handle the situation, and I feel sad for her because I was hurt as well. However, her behavior has threat[en]ed my livel[i]hood and well-being. I do not deserve to have my life ruined because of Bruce's lies and deceit. I have told Respondent multiple times about the misunderstanding, and have apologized on numerous occasions."

Cox further alleged in support of a restraining order that Wilson was seeking $8,000 from Cox for "bedding" and "lost jewelry" that Cox did not take; that Wilson was "angry and violent" and already had been ordered by a court in another case to undergo "counseling"; and that Wilson allegedly had gone to Bruce's workplace and "caused a scene that was embarrassing and inappropriate." Cox concluded she was fearful of Wilson and of losing her job because of Wilson's "continuous slander" of her.

Cox in her request for restraining order sought a personal conduct order preventing Wilson from contacting her directly or indirectly, and harassing, intimidating, and stalking her. Cox further requested Wilson be ordered to stay at least 100 yards from Cox, and Cox's home and workplace.

The record shows the court that same day issued a temporary restraining order, granting the personal conduct order but denying the stay-away order pending a hearing on May 14.

The April 19 temporary restraining order provided Wilson was not to "[h]arass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the peace of" Cox. It further provided Wilson was not to "[c]ontact the person [i.e., Cox], either directly or indirectly, in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means"; or "[t]ake any action to obtain [Cox's] address or location."

*Cox's Exhibits in Support of Petition*

Cox on May 1 submitted a second declaration under penalty of perjury in advance of the May 14 hearing. Attached to her May 1 declaration were two exhibits: Exhibit 1 included (i) a series of e-mails Cox received from Wilson on April 23, 2019, and (ii) an e-mail Wilson sent two days later, after Cox had contacted police. Exhibit 2 included e-mails Wilson had sent Cox beginning January 30, 2019, and included an e-mail Wilson wrote to Cox's former supervisor on April 18, 2019, ostensibly prompting Cox to seek the temporary restraining order the next day.

Turning to exhibit 1, at 10:40 a.m. on April 23, Wilson sent Cox an e-mail from a Gmail account that stated, "I received your lovely request for a restraining order today. Because you are representing yourself I am free to continue to contact you regarding this matter. However, I suggest that you consult an attorney before you continue with your lies. Because all of my contact has been in furtherance of filing a legal claim against you and is documented, nothing I did is actionable. Moreover, I plan to hire an attorney

4

and you will be responsible for all my legal fees and costs. I will make sure you are held accountable for perjury."

Wilson in this e-mail added, "Finally, I am requesting you to turn over all your emails and text messages with Bruce so that I can prepare my defense. If I do not hear from you within 24 hours I will begin to subpoena all the emails from ALL your emails accounts including your work email which I know you used with Bruce so that I can prove that you are lying about your statements in your declaration. I will also be forced to subpoena people to testify." The e-mail was signed, "Grace Wilson, esq."[4]

Exhibit 1 also included e-mails by Wilson to Cox at 1:17 and 1:40 p.m. that same day, in response to Cox's e-mails asking that Wilson stop "harassing" her about discovery and "invading [her] privacy." In the 1:17 p.m. e-mail, Wilson wrote, "Actually I am entitled to discovery as part of my financial part of my divorce, which is not final. Good luck."

In her 1:40 p.m. e-mail, Wilson wrote, "You [i.e., Cox] sleep in my bed potentially subjecting me to deadly diseases, stalk me, refuse to pay for the damage done to my property while calling me names and mocking me and now file a request for a restraining order full of blatant lies. Of course I am going to defend myself to the fullest extent legally allowed. Good luck keeping all your lies straight. I will start subpoenas and discovery right

---

[4]    The record shows Wilson is a member of the California Bar. As of February 7, 2019, she was designated as a vexatious litigant by the Superior Court San Diego County, in case No. 37201500040237CUDFCTL. Because Wilson was a defendant in this case, the prefiling vexatious litigant requirement did not apply to her. (See *John v. Superior Court* (2016) 63 Cal.4th 91, 100 [holding "[s]ection 391.7's prefiling requirements do not apply to a self-represented vexatious litigant's appeal of a judgment or interlocutory order in an action in which he or she was the defendant"].)

away in my divorce proceeding since I can see that you have no intention to be honest."

At 2:08 p.m., Cox wrote Wilson, "TRO in effect, please stop!" Less than 10 minutes later, Wilson wrote back, "I will say it again. As long as you are acting as your own attorney and I am acting as my own attorney I have a right to contact you and anyone I rightfully believe I need to do for my defense in this case and my divorce. Sorry but you should have thought about the ramifications of your behavior before you continued your harassment of me. Don't like me contacting you, pay for a lawyer."

Later that day at 4:52 p.m., Wilson again e-mailed Cox. Wilson asked Cox to split the costs of a court reporter that Wilson intended to retain for the May 14 hearing. Wilson also provided Cox with an information sheet from the "longbeach.gov" website providing an overview of section 527.6 and the definition of civil harassment.[5]  Wilson again advised Cox to obtain an attorney; and put Cox on notice she would be seeking "fees and costs for [Cox's] frivolous and perjurious accusations," and "all" of Cox's e-mails with "Bruce and others" as part of her right to discovery. A short while later, Cox responded, "There's a TRO granted, please stop harassing me."

Two days later, Bruce sent Cox and Wilson an e-mail at 12:52 p.m. Bruce stated he would agree to "take care of the bedding issue, but only if both of you agree to dismiss your cases against each other and move on with

---

[5]     As Cox pointed out in her trial brief, on the next page of that same information sheet was a section titled "No Discovery," which went on to state as follows: "A Civil Harassment case is a summary proceeding, intended to be fully resolved at the first hearing. Therefore, there is no opportunity for discovery, such as depositions, interrogatories, some types of subpoenas and document requests. If you wish to have discovery rights, or if you wish to avoid the higher standard of proof required in this type of case, you may file a superior court unlimited jurisdiction civil case and an application for preliminary injunction."

6

life." He added, "I'm sorry for the stress I have caused for both of you." Cox responded only to Bruce at 2:08 p.m., stating, "It's not about the bedding. It's about harassment and stalking."

At 4:49 p.m., Wilson sent Cox and Bruce a lengthy response to Bruce's earlier e-mail. Wilson maintained that she was entitled to investigate her "missing jewelry" and make efforts to "collect the debt" owed her; that LinkedIn was a "public forum that should only include truthful information," thus giving her the "right to ask for payment in anticipation of filing [her] lawsuit"; that she had not "threatened" Cox and was tired of "people being bullies and then lying like they are some type of victim"; that Cox was responsible for her "new and very expensive" bedding, after Cox admitted having sex with Bruce in the same bed; that her "jewelry went missing during the same time she [i.e., Cox] slept in [Wilson's] bed," which jewelry had a "ton of sentimental value"; that Cox's declaration in support of the temporary restraining order was "one giant lie," and she had "all the evidence [she] need[ed] to prove it"; that Cox would "be responsible for [Wilson's] attorney fees (probably up to 10K since [she was] looking to retain one from out of town)"; that she would "make sure the DA prosecutes [Cox] for her perjury as [she] refuse[d] to let people continue this nonsense"; and that if Cox was "concerned about her job, let[']s see what happen[s] with a perjury conviction."

Exhibit 2, as noted, contains a series of e-mails between the parties leading up to the issuance of the temporary restraining order. On January 30, 2019, Wilson wrote Cox demanding $3,000 to replace Wilson's bedding, stating Cox had until February 13 to make such payment "in full." Cox responded a short time later, stating, "My sincere apologies for the distress I might have cause[d] you and your family, however please keep in mind I was

7

not the only one involved. [¶] I'm not an evil person. I was misled and thought I was in a real relationship."

In a series of e-mails later that same day, Cox again offered Wilson her "deepest apologies," adding Bruce was "just as much to blame" as Cox. Cox complimented Wilson on her "beautiful family" and implored her not to let this "nonsense ruin that." In a follow-up e-mail a little later that day, Wilson stated Cox's DNA was on her sheets and bedding and either Cox needed to pay her, or she would institute "legal action." Cox responded Bruce had invited her into the home while they were dating.

Wilson replied, "I guess we will have to get DNA to determine the source," then added, "Btw I have had total access to all of his emails and texts so I know exactly how things went down. I wonder how many other 'beaut[iful] families' you have done this too? Given your attitude with me I think I might just want to warn other people about you. Who knows what diseases you spread."

In another series of e-mails later that same day, after Cox suggested Wilson "shouldn't be attacking the victims of [her] husband['s] prey," Wilson again demanded payment for the bedding, then added, "You [i.e., Cox] are nothing but a gold digging whore as confirmed by your soon to be ex."[6] Wilson in a follow-up e-mail continued to refer to Cox as a "whore," suggested Cox was responsible for Wilson's "missing jewelry," then added, "I think I might just have to warn all your coworkers about this. I would hate for anyone else to have to deal with what I am going thru [sic]." In a final salvo of e-mails, Cox reiterated she wanted to be left alone, and implored Wilson, whom Cox referred to as a "crazy ass," to stop threatening her.

---

[6]    It appears Wilson, ostensibly as a result of being married to Bruce, *may* have had access to certain (perhaps confidential) information concerning Cox's own divorce proceeding, as also discussed *post*.

The record shows Wilson sent Cox an e-mail on April 15, 2019, a few days before Cox sought the temporary restraining order. In this e-mail, Wilson wrote, "Would you please provide me with an address of [where] you can be served? Otherwise I have no problem going to your work." Cox responded Wilson was "insane." Wilson made another "settlement" offer to Cox, agreeing to take $2,000 along "with an admission of guilt" to resolve their dispute. Wilson also claimed she had "video" evidence from the bedroom. Cox wrote she was not paying "anything" and "not admitting to SHIT."

On April 18, the day before Cox sought and obtained the temporary restraining order, Wilson at 3:06 p.m. sent an e-mail to third-party "Ms. E[.]," with the subject line: "Sara Cox." Ms. E. was Cox's former supervisor. Wilson wrote, "Ms. E[.]—I am contacting you regarding Sara Cox who[m] you recommend on LinkedIn. I would hope that you would only recommend people that are ethical and Ms. Cox has no ethics. So I would ask that in the interest of anyone that might use Likedin, you would remove your recommendation of her. For background, Ms. Cox had an affair with my husband for almost a full year before either of them started divorce proceedings. She slept in my bed, stained it and now refuses to pay for her damage. At the same time she was sleeping with someone that was a drug addict. Both her and my husband endangered my life and I have minor children. She also badgered my husband into giving her a 'loan' that she had no intention of repaying. She has continually lied about her husband to take advantage of others, claiming that he was abusive.[7] Barely anything you say in her recommendation is true as she cannot even live within her means, spending more money than she has, preoccupied at work trying to juggle men

---

7    See footnote 6, *ante.*

and her adult disruptive children. Don't get me wrong, I blame my ex-husband as well. Neither of them are worth a damn. However, in addition to pay[ing] for my bedding, 3 pieces of jewelry went missing from my bedroom about the same time Ms. Cox slept in my bed. . . . I am going to continue an investigation until I find [the jewelry]. If you happen to see Ms. Cox with jewelry that matches th[e description provided], please contact me and the police immediately. I am sure that if you contact Ms. Cox she will say I am nuts and I lost a pretty bad lawsuit (which is true). But what she does not know is that I have been working with the State Bar of California and the DAs office because I have video evidence that proves something very different. And in any case Ms. Cox is a horrible person that cannot be trusted, calling me an 'angry bitch' just because I asked her to pay for my bedding. . . . Again all this goes to show that she should not be recommended for any position, she is a huge liability for anyone that comes in contact with her. [¶] Thank you, [¶] Grace Wilson."

A few hours later, after another exchange of e-mails, Wilson wrote that she would continue her "search" for the missing jewelry until it was found. Wilson added, "If you [i.e., Cox] return it now I will not report you to the police."

*Wilson's Response to the Petition*

Wilson on May 13 filed a response to Cox's petition. In asking the court to deny issuance of such an order, Wilson explained she wanted Cox to be "prosecuted for perjury"; claimed all of her contacts with Cox were "protected as an absolute privilege in furtherance of collecting a debt" for damage to, and the "theft" of, personal property; and further claimed that she had never "threatened" Cox, but that it was Cox who was stalking her on "social media."

10

Wilson also requested the court order Cox to pay attorney fees of $2,800, and court costs in excess of $3,000.

*The Court Hearings and its Ruling Granting the Order*

The record shows at the May 14 hearing, prior to the taking of evidence, the court gave the parties an overview of the case, noting that it had read Cox's papers including the exhibits; that, although it was mindful of the allegation that Cox had slept with Wilson's (former) husband, Wilson's e-mails to Cox sent under the "pretense of discovery requests" appeared to be harassing; that Cox "on numerous occasions articulated in writing that she was apologetic to Ms. Wilson . . . for having had an affair with Ms. Wilson's husband"; that Wilson "on a number of occasions told Ms. Cox that she wants Ms. Cox to pay Ms. Wilson for replacement for the bed"; that Wilson also "accused Ms. Cox of stealing Ms. Wilson's jewelry"; and that Wilson wrote "she will contact Ms. Cox's co-workers."

The court noted that in the January 30 e-mail exchange, Cox asked Wilson to stop contacting her; that Wilson's e-mails to Cox were "all under the auspices of being discovery requests and offers to settle," but were "replete with[] insults and threats and other very derogatory comments"; that Wilson contacted one of Cox's "references" on LinkedIn, who appeared to the court to be a "completely uninvolved person"; and that Wilson also threatened to have Cox served at work, ostensibly "to humiliate Ms. Cox."

Cox, who then was represented by counsel, rested without calling any witnesses, instead relying on exhibits 1 and 2 and her sworn declarations in support of her petition. Wilson then called Cox as an adverse witness. After some questioning, the court continued the matter to July 9; ordered Bruce, who was in attendance, to return to the next hearing; and denied Wilson's request to find Cox's coworker Tyisha M. in contempt and/or issue a bench

11

warrant for her failure to appear at the hearing, as discussed in more detail *post.*

At the continued hearing, Wilson again called Cox as a witness. During her questioning of Cox, Wilson claimed that Bruce had accessed her e-mail and had written the April 23 and April 25 e-mails to Cox in contravention of the temporary restraining order. Cox testified she stopped seeing Bruce in about June 2018; that at one point while dating Bruce, Cox looked up Wilson on her LinkedIn account; and that Wilson in response accused Cox of "stalk[ing]" her.

Cox further testified that she contacted police to report Wilson had violated the temporary restraining order after Wilson sent Cox the e-mails on April 23. Cox also testified that she believed Wilson, and not Bruce, had sent the e-mails, which Cox considered to be harassing and caused Cox to be fearful of Wilson.

Wilson also called Bruce as a witness. He testified Wilson at some point had told him that she had been ordered to take a "court class" for anger management. During her questioning, Wilson claimed that Bruce had "committed several bar violations," which Wilson intended to "hold[] over his head."[8] Wilson again claimed during her questioning that Bruce was the one who had sent the April 23 e-mails to Cox; and that he had done so to "level

---

8    In closing, Cox's counsel noted it was "somewhat ironic" that Wilson was accusing her former husband Bruce of "bar violations," when it was Wilson who threatened to have Cox prosecuted for perjury in what counsel claimed was a violation of rule 5-100 of the California Rules of Court. Counsel nonetheless informed the court that Cox did not want to pursue the matter because all she wanted was for Wilson to stop harassing her and "recourse" against Wilson if she did not. We note whether Wilson and/or Bruce *may* have violated one or more rules of professional conduct is not before us, and therefore, we express no opinion on such matters.

the playing field to get custody of [their] children," as the custody issue was still pending in their ongoing divorce proceeding.

Bruce denied using Wilson's account to e-mail Cox. He testified that both he and his mother also had been copied on some of the e-mails Wilson sent to Cox, including after Wilson had been served with the temporary restraining order. After Wilson concluded her examination, the court asked Bruce, "Have you ever sent any emails to Sara[] Cox from Grace Wilson's account?" to which Bruce answered, "No."

The record shows Wilson then made a lengthy statement to the court under the guise of cross-examining herself, again claiming that Bruce had been using her e-mail to contact Cox; that she had merely contacted Cox for payment of the bedding; and that, when Cox refused to pay, she merely had sought Cox's contact information to proceed with a lawsuit against Cox.

At the conclusion of what it noted was a "lengthy" hearing, the court found the instant case fell within the category of "knowing and willful course of harass[ment]." The court also found that the e-mails Wilson sent Cox were "authenticated" in a "number of ways," including by their content; that these e-mails were "harassing," as they showed a "pattern of conduct composed of a series of acts over a period of time however short that evidence . . . continuity of purpose"; that the e-mails were not constitutionally protected as Wilson argued; that such e-mails would cause a reasonable person to "suffer substantial emotional distress as defined as highly unpleasant mental suffering or anguish from socially unacceptable conduct . . . that no reasonable person in a civilized society should be expected to endure;" and that Cox in fact had suffered such emotional distress, which testimony the court found credible.

13

The court thus entered the Order in favor of Cox, set its duration for 18 months, and denied Wilson's request for attorney fees and "sanctions."

*Wilson's Opening Brief, Motion to Augment, and Reply Brief*

In her 50-page opening brief filed on February 3, 2020, Wilson under the rubric of "Due Process" argued at least *seven* different grounds in challenging the Order, including, by way of example only, that the court lacked jurisdiction to issue the Order because Cox committed multiple "felonies," and engaged in "fraud" by failing to pay the requisite costs associated with her application for a civil restraining order; that the Order violated Wilson's First Amendment rights, as it allegedly was not "content-neutral," and was vague, overbroad, and her speech was within the litigation and/or common interest privileges; and that the judge prejudicially erred in connection with certain evidentiary rulings, and was biased against her. As noted, Wilson also claimed the Order was not supported by substantial evidence.

Cox, in propria persona, on March 6, 2020, filed her brief (as amended). In her brief, Cox argued that many of the arguments raised by Wilson in her opening brief were improper; that Wilson's opening brief failed to include a proper summary of the facts; and that Wilson ignored the proper standard of review.

Rather than merely reply to Cox's brief, Wilson on May 26 filed a request to augment the record on appeal to include what Wilson claimed were five documents that had been omitted from the clerk's transcript. The documents were (1) an e-mail from April 18, 2019, which Wilson claimed included "highlights" by Cox that had not been included in the e-mail version attached to Cox's May 1 declaration in exhibit 1; (2) a May 9, 2019 e-mail from Bruce to Wilson showing that a witness Wilson sought to subpoena for

14

the May 14 hearing (i.e., Tyisha) had been served by an individual named "Nate"; (4) a February 13, 2020 proof of service by Bruce showing Wilson had been served with a notice of hearing and request for domestic violence restraining order (presumably in their divorce proceeding); and (5) an April 26, 2020 e-mail from California Western School of Law stating that an individual named Andrew R. was not in the school's clinical externship program.

In support of her request to augment, Wilson argued document (1), the April 18 e-mail, showed Cox altered and submitted false evidence to the court; and further argued she allegedly had no way of knowing that Cox "provided a fraudulently altered email to the [c]ourt" until Wilson began preparing this appeal and reviewed the court's transcript.

As to documents (2) through (5), Wilson argued they collectively showed Cox participated in "violating the Confidential Marital Provision and Attorney Client Privileges" of Wilson. Specifically, Wilson argued that, in her reply brief, she would show that Bruce, while "at least pretend[ing] to be [Wilson's] legal advisor in this matter, worked on this matter for [Cox]," including allegedly preparing Cox's "pleadings."

The day after seeking to augment the record, Wilson filed her reply brief. As promised, Wilson's arguments in reply relied on documents attached to her motion to augment. In reply, Wilson argued Cox violated her right to a fair trial "by having [Bruce] provide legal services to [Cox] in this matter," in violation of Wilson's marital and attorney-client privileges set forth in Evidence Code sections 980 and 954, respectively.

On June 2, 2020, Cox filed an opposition to the motion to augment. Cox argued documents (1) through (5) were not merely "omitted" from the clerk's transcript, but were not included in the record because none of them had

been, or, with respect to a few of the documents that post-dated the Order, could have been, considered by the court in granting the Order. On June 4, this court ruled the request to augment would be considered concurrently with the appeal.

## DISCUSSION

A. *Request to Augment and Wilson's Reply Brief*

As a threshold matter, we deny Wilson's opposed request to augment the record.[9] Wilson relies on documents (1) through (5) to support issues raised for the *first* time in her reply brief. (See *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [noting that "[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument"]; *Altavion, Inc. v. Konica Minolta Systems Laboratory Inc.* (2014) 226 Cal.App.4th 26, 63, fn. 27 [argument made for the first time in reply brief is forfeited].)

Moreover, Wilson's request to augment with documents not in existence at the time of the July 2019 evidentiary hearing, or, if in existence, with documents that were not considered by the court at that hearing, violates the long-standing rule that " ' "an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." [Citation.] This rule reflects an "essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . ." [Citation.] The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a

---

9    As we noted *ante* in footnote 3, shortly before oral argument in this case Wilson made a second request to augment the record, which request we denied.

16

meaningful record for review, and serves to avoid prolonged delays on appeal.' " (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 442.) For this additional reason, we deny Wilson's request to augment.

In any event, we are unconvinced these documents support Wilson's claim that Cox committed a fraud on the trial court (i.e., document (1)). Or that Cox somehow violated Wilson's due process rights by allegedly continuing to seek legal counsel from Bruce (i.e., documents (2) through (5)), while he, at some point, was in his own divorce proceedings, and, based on Wilson's claim, was still subject to one or more privileges held by Wilson. Such claims are not only entirely speculative based on the content of these documents, but, even if credited, it is not clear why Cox would be responsible for violating Wilson's due process rights based on any privilege between Wilson and Bruce.

In sum, we deny Wilson's request to augment. We also find she has forfeited on appeal the claims she raises for the first time in her reply brief based on that request.

B. *Wilson's Burden on Appeal*

" 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) " 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Ibid.*)

On appeal, a brief must include appropriate citations to the facts in the record. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655.) "Because '[t]here is no duty on this court to search the record for evidence' [citation], an

17

appellate court *may* disregard any factual contention not supported by a proper citation to the record [citation]." (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379.)

Although a member of the California bar, Wilson nonetheless is appearing in propria persona in this appeal, as we have noted. Her status as such does not, however, exempt her from the rules of appellate procedure or relieve her of their burden on appeal. (See *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984; see also *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 (*Nwosu*) [noting self-represented litigants "must follow correct rules of procedure" and their failure to do so forfeits any challenge on appeal].)

As part of her appellate burden, Wilson was obligated to provide a statement of facts in her opening brief in conformance with California Rules of Court, rule[10] 8.204(a)(2)(C), which requires a "summary of the significant facts limited to matters in the record." Under this rule, Wilson was required to "summarize *all* the evidence presented" in the evidentiary hearing. (See *Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 260, italics added; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 (*Schmidlin*) [recognizing that a " 'party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence on that point*, *favorable and unfavorable*, and *show how and why it is insufficient*' " (italics added), or risk having the claim of error forfeited on appeal].)

We have read the entire appellate record in this case. Wilson's version of "facts" in her opening brief is decidedly one-sided, in contrast to the record evidence. Her summary omits many key facts on which the court relied in finding Wilson engaged in harassment within the meaning of section 527.6,

---

10     Unless noted otherwise, all further rule references are to the California Rules of Court.

including that, while the temporary restraining order was in effect, *Wilson* sent Cox myriad e-mails, despite the requirement in the temporary restraining order that Wilson refrain from contacting Cox either "directly or indirectly" including through email, pending the outcome of the May 14 hearing. Wilson's factual summary instead appears to be merely an attempt by her to reargue the merits of the temporary restraining order and Order.

For example, in the opening paragraph of her summary, Wilson states that Cox had been "stalking" her; that "video" footage from one or more bedroom cameras showed Cox had been in the same area where Wilson kept some of her jewelry, which had gone missing; and that after she had contacted Cox by e-mail on January 30 seeking to "recoup[] the cost of some of her damages," Cox "[i]mmediately . . . started to hurl insults at [her], blame others for [Cox's] bad behavior and tell [her] about other affairs" by Bruce.

Once Wilson obtained the results from the DNA testing, which per Wilson ostensibly showed the bedding stains came from an "Asian female," Wilson in her summary states she contacted Cox in mid-April, in yet another attempt to settle the matter; or to obtain Cox's contact information in order to serve Cox with a lawsuit. According to Wilson, Cox again "immediately began hurling insults" at her and continued to stalk her, merely because she wanted to "find her missing jewelry."

Regarding the issuance of the temporary restraining order, Wilson in her summary states that Cox lied about being threatened by Wilson in order to avoid paying the costs associated with the restraining order and the service thereof. Wilson further states at no time did she contact Cox after the temporary restraining order issued, which, as noted, is in direct contravention of the court's finding in this case.

19

Candidly, this is merely the tip of the proverbial iceberg. Wilson in her summary also takes issue with Cox's testimony that she lost 30 pounds and suffered severe emotional distress as a result of Wilson's harassment. Wilson's summary also states that the court had "prejudged" the case, as discussed in more detail *post*; that Cox had presented "altered emails"; and that the Order prevented Wilson "from investigating her stolen jewelry which cause[d] [her] to suffer irreparable injury," among other "facts."

What Wilson does *not* say in her factual summary, however, is that, despite Cox's repeated apologies and pleas for peace, Wilson continued to blame Cox for stealing her jewelry and ruining her bedding; berated and insulted Cox in several e-mails, calling Cox a "whore" and "gold-digg[er]" among other derogatory names; accused Cox of committing perjury subjecting Cox to criminal punishment; and contacted Cox's former supervisor via LinkedIn, after repeatedly threatening Cox in several earlier e-mails to warn Cox's coworkers and others "about" Cox.

Regarding the latter e-mail, the court noted Cox's former supervisor had absolutely nothing to do with the dispute between Wilson and Cox, a fact Wilson also omitted from her summary. Wilson's summary also failed to mention that in this April 18 e-mail, Wilson wrote that Cox was not to be trusted; that Cox had no "ethics"; that Cox had accepted a loan from Bruce with no intention of repaying it; and strongly implied that Cox had stolen her jewelry, at one point—after describing the missing pieces—asking Cox's former supervisor to call the police if the supervisor saw Cox wearing it. (See rule 8.204(a)(2)(C); see also *Schmidlin*, *supra*, 157 Cal.App.4th at p. 738.)

As is evident, Wilson, in her ill-fated attempt to reargue the merits of the case, failed to set forth all material evidence in her factual summary, as opposed to " '*merely* [her] *own evidence*.' " (See *Nwosu*, *supra*, 122

20

Cal.App.4th at p. 1246, quoting *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Fallon*); see also *Schmidlin, supra*, 157 Cal.App.4th at p. 738 [requiring a party in summarizing the evidence to include both favorable *and* unfavorable facts].) Thus, to the extent Wilson claims a particular finding by the court is not supported by sufficient evidence, including the findings she engaged in harassment of Cox, and Cox, in response, suffered substantial emotional distress (see § 527.6, subd. (b)(1) & (3)), we conclude she has forfeited those claims on appeal. (See *Fallon*, at p. 881; *Nwosu*, at p. 1246.)

Even if we assume Wilson on appeal has not forfeited her sufficiency of the evidence claim based on her failure to accurately summarize all the evidence presented during the hearing in the light most favorable to Cox, we nonetheless reject this claim of error on the merits.

C. *The Order Is Supported by Ample Record Evidence*

1. Guiding Principles

"Section 527.6 is intended 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' (Stats. 1978, ch. 1307, § 1, p. 4294; see Cal. Const. art. I, § 1.) The court in *Smith v. Silvey* (1983) 149 Cal.App.3d 400, recounted a portion of the legislative history in order to explain the statute's purpose: 'An analysis prepared for the Senate Committee on Judiciary (1977–1978 Reg. Sess.—Assem. Bill No. 3093) saw the purpose as follows: "Under existing law, a victim of harassment may bring a tort action based either on invasion of privacy or on intentional infliction of emotional distress. Where great or irreparable injury is threatened, such victim may obtain an injunction under procedures detailed in [section] 527(a). [¶] This bill would establish an expedited procedure for enjoining acts of 'harassment' as defined, including the use of temporary restraining orders. . . . [¶] The purpose of the bill is to

provide quick relief to harassed persons." ' (*Id.* at p. 405.) It follows that if there is no likelihood of future harm, there is no necessity for an expedited procedure for relief. Indeed, under subdivision (d) a court cannot issue an injunction unless it finds by clear and convincing evidence that 'unlawful harassment *exists*' (§ 527.6, subd. (d), not that it existed in the past." (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 403.)

As relevant here, under section 527.6 " '[h]arassment' is . . . a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).) A " '[c]ourse of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including . . . making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means . . . ." (*Id.*, subd. (b)(1).)

If, after a hearing, the trial court "finds by clear and convincing evidence that unlawful harassment exists," the court "shall issue" an order "prohibiting the harassment." (§ 527.6, subd. (i).) "An injunction restraining future conduct is . . . authorized when it appears that harassment is likely to recur in the future." (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 496 (*Harris*).)

"We review the trial court's decision to grant the restraining order for substantial evidence." (*Harris, supra*, 248 Cal.App.4th at p. 497.) " 'The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. [Citation.] But whether the facts, when

22

construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under [Code of Civil Procedure] section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review.' " (*Harris*, at p. 497.)

In connection with substantial evidence review, we note our high court in *Conservatorship of O.B.* (2020) 9 Cal.5th 989 (*O.B.*)) just recently clarified the standard we must use in evaluating a sufficiency of the evidence claim when the clear and convincing standard of proof is applied by the trier of fact. It concluded: "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 995–996.)

2. Analysis

As summarized *ante* from our own independent review, the record as a whole contains substantial evidence "from which a reasonable factfinder could have found it highly probable" (see *O.B.*, *supra*, 9 Cal.5th at p. 996) that Wilson engaged in "course of conduct" "harassment" as defined in section 527.6, subdivision (b)(1) and (3).

Indeed, the record shows that Wilson engaged in a "pattern of conduct composed of a series of acts over a period of time . . . evidencing a continuity of purpose," both before *and* after the temporary restraining order issued.

23

(See § 527.6, subd. (b)(1).)  Although Wilson claimed she was merely seeking payment from Cox for ruined bedding and/or missing jewelry, the record shows the tone and content of these emails went well beyond that purpose, and instead amply support a finding of "harassment" as defined under the statute.  (See *id.*, subd. (b)(3).)

*Before* Cox obtained a civil harassment restraining order on April 19, 2019, as noted Wilson sent Cox a series of e-mails beginning in January referring to Cox as a "whore" and "gold[-]dig[er]"; accusing Cox of stalking her, having "diseases," being a liar, and committing perjury; threatening, and finally making good on such threats, to warn "other people," including Cox's former supervisor, about Cox and her lack of "ethics"; and claiming to have "video evidence" of Cox and Bruce, as Wilson persisted in her efforts to obtain payment from Cox for property damage.

During this time frame, Cox reiterated to Wilson that she was sorry for what had happened; that Cox too had been a victim, as she believed Bruce when he had told her his marriage was over, as Cox also came to believe their relationship was "real"; and that she just wanted Wilson to leave her alone and stop threatening her.

*After* Cox obtained the temporary restraining order, Wilson, in contravention of that order,[11] e-mailed Cox on April 23 confirming she had been served, and claimed—albeit incorrectly—she was not bound to follow the restraining order because Cox was self-represented and she was an attorney.  In this same email Wilson called Cox a liar, stated Cox would be held "accountable for perjury," warned Cox that she was going to hire her own attorney and Cox would be responsible for all of her "legal fees and

---

11    Subdivision (t) of section 527.6 provides:  "Willful disobedience of a temporary restraining order or order after hearing granted pursuant to this section is punishable pursuant to Section 273.6 of the Penal Code."

24

costs," and requested Cox turn over "all" text messages and emails between Cox and Bruce, ostensibly including messages and emails that may have been subject to the attorney-client privilege, written when Bruce was representing Cox in her own divorce proceeding.

After Cox responded that Wilson needed to stop harassing her, Wilson emailed Cox, again in contravention of the temporary restraining order. Wilson wrote she was entitled to discovery and would start the process of obtaining such discovery "right away"; and once again accused Cox of subjecting her to "deadly diseases," and of "stalk[ing]" and "mocking" her.

Cox again responded, "TRO in effect, please stop!" Less than 10 minutes later, Wilson emailed back, reiterating she had every right to continue to contact Cox, adding: "Don't like me contacting you, pay for a lawyer." Wilson continued to email Cox throughout the day, making many of the same accusations and claims as she had made in her earlier emails. Wilson did so even after Cox again informed Wilson her emails were in violation of the temporary restraining order and were harassing.

Wilson also violated the temporary restraining order on April 25, in response to an email from Bruce apologizing to Wilson and Cox for the "stress" he had caused them. In this lengthy email to Cox and Bruce, Wilson reiterated the same accusations and claims against Cox that she had made in many, if not most, of her earlier emails to Cox, adding that she would "make sure the DA prosecutes [Cox] for her perjury," and that, if Cox was "concerned about her job, let['s] see what happen[s] with a perjury conviction."

The record further shows that Wilson made the same claims and allegations against Cox at the evidentiary hearing; that Wilson also claimed there were unresolved issues in her divorce with Bruce, including custody

issues; and that the court was concerned that absent the issuance of the Order, Wilson would continue to harass Cox, as Wilson had done so through e-mail.

The record also contains substantial evidence to support the court's finding that Cox suffered "substantial emotional distress" as a result of Wilson's harassment (see § 527.6, subd. (b)(3)); and that such harassment would also cause a "reasonable person" to suffer such distress (see *ibid.*). Indeed, in addition to the tone and content of Wilson's repeated emails, as summarized *ante*, and Wilson's repeated violation of the temporary restraining order, Cox also testified she had lost weight, was unable to sleep, and in constant worry Wilson would show up at her workplace or contact her coworkers.

Based on the foregoing, we conclude the record as a whole contains substantial evidence "from which a reasonable factfinder could have found it highly probable" (see *O.B.*, *supra*, 9 Cal.5th at p. 996) that Wilson engaged in "course of conduct" "harassment" of Cox as defined in section 527.6, subdivision (b)(1) and (3). As such, on the merits we reject Wilson's claim of error on the ground of insufficiency of the evidence.[12]

---

[12] As noted *ante*, to the extent there *may* have been conflicting record evidence that *may* have supported a different result or a different set of findings does not change our analysis and conclusion on this issue. (See *Fallon*, *supra*, 3 Cal.3d at p. 881 [noting when a " 'finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact' "].)

D. *Remaining Claims*

1. Forfeiture

As noted *ante*, Wilson raised a series of claims in her opening brief based on the alleged violation of her due process rights. To the extent those claims were raised in the trial court and/or involve pure questions of law based on *undisputed* facts, we conclude they are not forfeited on appeal. (See *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [noting a "litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts"].) However, to the extent such claims were not raised in the trial court and involve mixed questions of law and fact, we deem them forfeited on appeal. (See *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591–592 (*Perez*).)

With these principles in mind, we decline to address the following claims of Wilson in the order and lettering/numbering she presented in seriatim in her opening brief: "[A.] 1. Respondent [Cox] is obstructing justice by actively engaging in a felony" (capitalization omitted);[13] "[A.] 2. Respondent obstructed justice with past felonies" (same);[14] "[C.] The trial court's order is vague and precluded legitimate purposes in violation of the

_____

[13] Wilson argues in connection with this issue that Cox allegedly obstructed justice by "actively engaging in multiple crimes" in violation of various sections of the Penal Code, all in violation of Wilson's due process rights.

[14] With respect to this issue, Wilson argues Cox "intentional[ly] lie[d]" about being unable to sleep or eat for 10 months. As a result of this "blatant lie," Wilson further argues Cox obstructed justice by failing to "pay[] the required fee for her complaint nor the fee associated with having the Sheriff's office serve the subpoena upon Appellant."

27

First Amendment" (same);[15] "[D.] The trial court's order is overbroad in violation of the First Amendment and appellant's right to a fair trial under defamation" (same);[16] and "[E.] Privileged Communications" (same).[17] (See *Perez, supra,* 169 Cal.App.4th at pp. 591–592.)

---

[15]  Wilson argues the court's Order preventing her from "harassing [Cox] and from taking any action to obtain her address or location" was "solely based upon [Cox's] emotional response," adding: "The problem with this standard is that Respondent may have stolen Appellant's jewelry and plumbing [*sic*] and did in fact damage her bed. And while Appellant has lost all hope for the return of her sentiment[al] jewelry and the statute of limitation has expired on her bedding damages claim, it is nevertheless an unlawful restriction." In a footnote in support of the "plumbing" reference, Wilson states: "Appellant recently discovered that the source of her ongoing plumbing issues is an exorbitant amount of wipes that were flushed down her toilets. The costs have run into the thousands of dollars and Appellant has probabl[e] cause to believe that Respondent [Cox] is the sole source of the damage."

[16]  In connection with this issue, Wilson argues that the "gravamen of Respondent's grievance is her distaste for the content of Appellant's message to others and concern for her reputation because Appellant told another person about [Cox's] adultery"; that Wilson was "free to communicate with others who may be perfectly willing to listen"; that Wilson had the constitutional right to communicate with another LinkedIn member; and that Wilson's communication about Cox was speech "about Respondent, not directed at her as that term is used in the civil harassment statutes."

[17]  Wilson argues in connection with this issue that her communications with Cox and the "LinkedIn contact clearly fall solely within the litigation privilege," noting: "Based upon *video evidence*, Appellant had a good faith belief in a legally viable claim for both damage to bed and jewelry and thus acted with legitimate purpose" in emailing Cox with what Wilson claimed were "prelitigation demand letters to negotiate a settlement for damage to her property." (Italics added.) We note in passing that, although Wilson has repeatedly claimed to have video evidence of Cox and Bruce, Wilson did *not* offer the video as evidence at the July 9 hearing, nor was such evidence included in the record.

28

This leaves the following claims for resolution: "[B.] The trial court's order is a prior restraint in violation of the First Amendment" (capitalization omitted); "[F.] Exclusion of evidence" (same); and "[G.] Abuse of Discretion—Judge's Bias" (same).

2. <u>Analysis</u>

a. Prior restraint

We agree section 527.6 does not apply to constitutionally protected activity. (§ 527.6, subd. (b)(1) [providing that "[c]onstitutionally protected activity is not included within the meaning of 'course of conduct' "]; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 652.) However, it is well-settled that not all speech or petition activity is constitutionally protected. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 313; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134 [noting that the right to free speech is not absolute, and that a "statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity"].)

"In California, speech that constitutes 'harassment' within the meaning of section 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief." (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250.) The right to free speech "does not include the right to repeatedly invade another person's constitutional rights of privacy and the pursuit of happiness through the use of acts and threats that evidence a pattern of harassment designed to inflict substantial emotional distress." (*People v. Borrelli* (2000) 77 Cal.App.4th 703, 716 [addressing a substantially identical statute, Penal Code section 646.9, prohibiting stalking].)

29

Here, as noted, the trial court conducted what turned out to be a lengthy evidentiary hearing. Wilson was given an opportunity to present evidence at the hearing in response to the documentary evidence submitted by Cox. After conducting this mandated hearing (see § 527.6, subd. (g)) and weighing the evidence and the credibility of the parties, the trial court found Wilson engaged in "course of conduct" "harassment" of Cox pursuant to section 527.6, subdivision (b)(1) and (3), which findings, as we have noted, are amply supported by the record. (See *O.B.*, *supra*, 9 Cal.5th at p. 996.)

We thus reject Wilson's claim that the Order was a prior restraint on her First Amendment rights because her conduct in this case is not entitled to constitutional protection. (See *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 729–730 [noting the state has expressed, by statute and in the California Constitution (§ 527.6; Cal. Const., art. I, § 1, respectively), a compelling interest in protecting individuals from harassing conduct].)

b. Exclusion of evidence

Wilson claims the court committed error when it denied her request to hold third-party witness Tyisha in contempt and/or to issue a bench warrant for her failure to appear at the May 14 hearing. The record shows Cox in her petition listed coworker Tyisha as being a witness to Wilson's harassment of Cox on April 18, 2019. At the May 14 hearing, the court allowed Wilson to question Cox regarding Tyisha's knowledge of such.

Cox testified that Tyisha in the past had seen Cox "crying at work" and "leaving work early" because Cox had been "upset" by Wilson's ongoing harassment; that Cox was at work on April 18 when she received Wilson's e-mail to Cox's former supervisor, which e-mail she then showed to Tyisha; that Cox was not "embarrassed" by the e-mail, as Tyisha knew Cox at some

30

point had been in a "relationship" with Bruce; and that Cox had told Tyisha that the "relationship" was a "mistake" and Wilson was "harassing" her.

Cox further testified that after work on April 18, she had e-mailed Tyisha all of Wilson's e-mails, including the ones from April 18, and had asked Tyisha to print them out for her; and stated she would pick them up the next morning on her way to court, as she intended to seek a temporary restraining order against Wilson.

During this same questioning, Wilson also asked Cox if Tyisha had a "private printer" which question was sustained on relevancy grounds; why Cox did not "print them [i.e., Wilson's e-mails]" to which Cox responded, "I don't have a printer at home"; and "what exactly did [Tyisha] witness, other than [Cox] sending her [Wilson's] emails?" to which Cox responded, "That's it. Just the e-mails. And how upset I am. I have left work early, I have taken time off. She knows that every time I get your e-mail, I'm afraid. I called security. I warn people in the front office that you might come by."

The record shows the court then asked Wilson if she had any other questions for Cox. Wilson responded by asking for a continuance, adding: "I'd like to do some discovery about security and her [i.e., Cox's] time off at work, your Honor, because I'm not buying her story about how afraid she was. And I would like to have a bench warrant out for [Tyisha], please, your Honor." The record further shows the court granted the continuance, but over Wilson's objection refused to issue a bench warrant for Tyisha or otherwise sanction this witness for failing to appear at the hearing.

In refusing such relief, the court noted Tyisha was not a "necessary witness" based on the information provided to the court and the allegations in this case. The court found Tyisha "essentially . . . served as a conduit to print

31

e-mails" sent by Wilson, for Cox's use in connection with her filing the petition.

We conclude the court properly exercised its broad discretion in refusing to find Tyisha in contempt, or to issue a bench warrant, as a result of her failure to appear at the May 14 hearing. (See *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446 (*Christ*) [a trial court's decision to admit or exclude evidence is reviewed on appeal for abuse of discretion].) Wilson's offer of proof, when followed up by her questioning of Cox, showed Tyisha was at most a peripheral witness to the harassing conduct of Wilson.

In addition, we further conclude that even if the court erred in refusing the relief sought by Wilson, that error was harmless. (See *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332 (*Saxena*) [recognizing that, "[e]ven where a trial court improperly excludes evidence, the error does not require reversal of the judgment unless the error result[s] in a miscarriage of justice"]; Cal. Const., art. VI, § 13.)

For the same reasons, we reject Wilson's claim the court erred when, after reviewing certain e-mails in camera between Bruce and Cox as requested by Cox, it ruled to exclude two such e-mails based on the attorney-client privilege. (See Evid. Code, § 952.) Although the court found these two e-mails privileged, Wilson in her opening brief nonetheless *quotes* them in support of her claim of error (as opposed to submitting the e-mails under seal).[18]

---

18    As noted *ante* in footnotes 6 and 7, it appears Wilson had access to Cox's confidential information as a result of Wilson's marriage to Bruce.

Wilson did so despite the fact Cox is the privilege-holder and Cox had refused at the evidentiary hearing to waive the privilege. (See Evid. Code, § 953, subd. (a) [the client is the holder of the privilege]; and *id.*, § 954, subd. (a) [the client as the "holder of the privilege" may prevent disclosure of a privileged communication by another person].) In any event, as noted we reject this claim of error and find any such error was harmless. (See *Christ, supra*, 2 Cal.App.5th at p. 446; *Saxena, supra*, 159 Cal.App.4th at p. 332.)

c. Judicial bias

Finally, Wilson claims the court was "predisposed to rule against [her] based on a preconceived notion that the case involved [a] run-of-the-mill dispute between a wife and a mistress." We note at or near the beginning of the May 14 hearing, the court took about an hour recess to allow Wilson to review documents, noting it did not want Wilson to "feel rushed" and wanted to give her a "meaningful" opportunity to read them.

After the recess, at the request of Cox's counsel the court summarized the allegations in Cox's petition for a civil harassment restraining order. In so doing, the court noted it had not yet read Wilson's response to the petition, as the response was not in the court's electronic filing system, and Wilson had just given the court a paper copy of her response.

The trial judge in his summary noted that "being a person who lives in the world," he recognized "how emotionally distressing" it could be for Wilson because Cox had "slept with Ms. Wilson's husband." The court added, "I will take note of that."

After summarizing the allegations ostensibly from prepared notes, which summary, in light of our independent review of the record, was quite accurate, the court stated, "So perhaps I got that wrong, perhaps my review of what I read was off. The reason why I read it out loud is so at least both of

33

you can understand what it was that I read and you can perhaps fill in the information, fill in the details, and inform me of whether I was correct or not, but at least now you know where I'm coming from having read this, Ms. Wilson and Ms. Cox."

As noted, the court then continued the evidentiary hearing at Wilson's request. At the continued July hearing, Wilson called Cox as a witness, which testimony is summarized *ante*. The record shows Wilson extensively questioned Cox on myriad subject matters. The record also shows Wilson called her former husband Bruce and extensively questioned him as well.

On this record, we conclude Wilson has failed to show the court had prejudged the case or was otherwise biased against her. Merely because the court made rulings adverse to Wilson, and ultimately found against her in issuing the Order, is not evidence of bias. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1112 [noting that "[m]ere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias," and that "a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review"], overruled on another ground as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) We thus reject this claim of error.

34

## DISPOSITION

The Order granting Cox's civil harassment restraining order is affirmed.  Cox to recover her costs of appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.

35